UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IN RE:  DEEPWATER HORIZON
BELO CASES

Case No. 3:19cv963-MCR-HTC

*This Order Relates to:*

**Edward Dunklin, 5:19cv231**
**Jackie Feagin, 3:19cv424elp**
**Phillip B. Gander, 3:19cv1983**
**Nicole Mills, 3:19cv426**
_____/

## REPORT AND RECOMMENDATION

Plaintiffs, represented by the Falcon/Lindsay Law Firms[1] in this second group of test cases, were clean-up workers hired to assist with the aftermath of the Deepwater Horizon oil spill.  Plaintiffs sue Defendants BP Exploration and Production, Inc., and BP America Production Co. (collectively "BP") for chronic sinusitis and ocular disease,[2] which were diagnosed years after the spill occurred, and which, they contend, were caused by exposure to the chemicals in the weathered oil or dispersants used as part of the clean-up efforts.  To succeed on their claims, Plaintiffs must show, through expert testimony, that a chemical or mixture of

---

[1] The firms representing these Plaintiffs are the Falcon Law Firm and Lindsay & Lindsay, P.A.

[2] Plaintiffs Feagin and Mills complain of chronic conjunctivitis and chronic dry eye syndrome. Plaintiff Dunklin complains of conjunctivitis and rhinitis.  Plaintiff Gander complains of chronic rhinitis.

chemicals in the oil spill caused their conditions. In a toxic tort case, the causation inquiry involves both general causation and specific causation. Because these proceedings have been bifurcated, the question before the Court today is whether Plaintiffs have met their burden for general causation, at least sufficient to send the question to the jury and proceed to specific causation.

Plaintiffs have identified three (3) experts, Dr. John Cherrie, Dr. Rachael Jones, and Dr. Jerald Cook. Dr. Cook, however, is Plaintiffs' sole general causation expert; Drs. Cherrie and Jones offer exposure assessment opinions. Pending before the Court are BP's motions to exclude each expert, ECF Docs. 461 (Cherrie), 463 (Cook), and 464 (Jones); BP's related motion for summary judgment, ECF Doc. 465; and Plaintiffs' motion to admit expert testimony based on spoliation of evidence, ECF Doc. 547. Upon careful consideration of the evidence presented, after extensive briefing, and following a hearing, the undersigned finds BP's motion to exclude Dr. Cook should be GRANTED, BP's motion for summary judgment should be GRANTED, and Plaintiffs' spoliation motion should be DENIED. Plaintiffs have also filed a motion to supplement their opposition to the *Daubert* motion for Dr. Cook, ECF Doc. 558, which the undersigned recommends be DENIED. Additionally, the undersigned recommends BP's motions to exclude Drs. Cherrie

and Jones be DENIED as MOOT, along with the related motions to strike and
motions for leave.[3]

Dr. Cook was designated for the first time as an expert in any BELO case in
this second test group.  Since that time, however, Dr. Cook's opinions have been
offered in over 100 other BELO cases and in *every* case in which BP has moved to
exclude Dr. Cook's opinions, they have been so excluded.  Despite Dr. Cook having
submitted a more robust omnibus report in those other cases than the one he
submitted here,[4] the courts in the Eastern District of Louisiana have, over and over
again, found Dr. Cook's opinions fail to meet *Daubert*[5] muster.  Specifically, in each
instance the courts have excluded Dr. Cook for (1) failing to identify a harmful dose
of any chemical in the oil which could cause the medical conditions at issue; (2)
failing to identify a specific chemical of concern; and (3) failing to follow a reliable

---

[3] The motions related to BP's *Daubert* motions for Dr. Jones and Dr. Cherrie are:  (1) BP's motion
to strike the supplemental declaration of Dr. Jones, ECF Doc. 528; (2) BP's motion to strike the
supplemental declaration of Dr. Cherrie, ECF Doc. 524; (3) Plaintiffs' motion for leave to file a
supplemental opposition to BP's motion to exclude Dr. Jones, ECF Doc. 557; and (4) Plaintiffs'
motion for leave to file a supplemental opposition to BP's motion to exclude Dr. Cherrie, ECF
Doc. 559.
[4] Dr. Cook's report in these test cases is 19 pages long; his more current reports are over 100
pages long.  ECF Doc. 463 at 6.  Also, in the more recent cases, Dr. Cook has been submitting
the same omnibus, non-case specific opinion.  *See Brumfield v. B.P. Expl. & Prod., Inc.*, 2022
WL 17251113, at *5 (E.D. La. Nov. 28, 2022).  Nonetheless, as one court recently noted, seven
sections of the Eastern District of Louisiana have excluded Dr. Cook based on an earlier report
dated March 14, 2022, and his June report "does not appear to make any changes that disturb the
reasons for excluding the March version."  *Charles v. BP Expl. & Prod., Inc.*, 2022 WL
16739435, at *3 (E.D. La. Nov. 4, 2022).
[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

methodology in reaching his conclusions.[6]  As Plaintiffs' counsel acknowledged at the hearing, there has not been a BELO case yet in which Dr. Cook's opinions were deemed to be admissible.

At the hearing, Plaintiffs were unable to articulate to the Court why the result here should be any different, other than the other courts just got it wrong.  The undersigned has reviewed those decisions and does not find that to be the case.  To the contrary, the decisions from the Eastern District of Louisiana are consistent with this Court's decision in *In re Deepwater Horizon Belo Cases*, No. 3:19cv963, 2020 WL 6689212, at \*12 (N.D. Fla. Nov. 4, 2020), *aff'd sub nom.*, *In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022) (the "Williams Order"),[7] excluding plaintiffs' expert, Dr. Patricia Williams, in the first set of test cases.  The undersigned agrees with the other BELO courts, Dr. Cook's opinions fall exceedingly short of what is required to satisfy the *Daubert*

---

[6] *See, e.g.*, *Brister v. BP Expl. & Prod., Inc.*, 2022 WL 4534752, at \*6 (E.D. La. Sept. 28, 2022) (excluding Dr. Cook because "[a]t no point in his report does Dr. Cook adequately identify what level of exposure to the chemicals present in the oil is capable of producing the harmful health effects alleged by Plaintiff"); *Dawkins v. BP Expl. & Prod., Inc.*, 2022 WL 2315846, at \*7 (E.D. La. June 28, 2022) (finding that "Dr. Cook's failure to identify the level of exposure to a relevant chemical that can cause the conditions asserted in plaintiff's complaint renders his opinion unreliable, unhelpful, and incapable of establishing general causation"); *Barkley v. BP Expl. & Prod. Inc.*, 2022 WL 2342474, at \*4 (E.D. La. June 29, 2022) ("Dr. Cook fails to identify the dose of any such chemical that would result in the adverse health effects contained in his report, and his report is therefore unreliable and inadmissible.").

[7] The Williams Order can also be found at ECF Doc. 97.

standards on general causation.  In fact, Dr. Cook's opinions offer even less than the opinions of Dr. Williams.

## I.    BACKGROUND[8]

On April 20, 2010, a massive and unprecedented oil spill occurred in the Gulf of Mexico when the Deepwater Horizon mobile offshore oil-drilling rig located approximately 125 miles offshore of Florida exploded.   During the months immediately following the explosion, over 90,000 people and 7,000 vessels were employed to address the Deepwater Horizon oil spill ("DWH Spill").  The incident resulted in thousands of claims being filed against BP, which were all originally consolidated in the Eastern District of Louisiana as part of the Deepwater Horizon multidistrict litigation (MDL No. 2179).  The MDL court approved a comprehensive Medical Benefits Class Action Settlement Agreement ("Settlement Agreement") for personal injury plaintiffs.  The Settlement Agreement provided a claims process for eligible class members who were diagnosed with a specified physical condition on or before April 16, 2012, and a separate litigation option for those seeking compensation for "Later-Manifested Physical Conditions" ("LMPCs"), defined as a physical condition diagnosed after the April 2012 cutoff date.[9]

---

[8] The Williams Order contains a detailed discussion of the background of this litigation, the DWH Spill, response and data collection, and a discussion of the makeup and constituency of crude oil and dispersants.

[9] This separate litigation of claims is known as the "Back End Litigation Option" ("BELO").

Over 500 BELO cases have been filed in, or transferred to, this District by plaintiffs claiming LMPCs. The Court consolidated those cases into this master action. The Court initially selected the First Trial Pool Cases for discovery and stayed the remaining cases. The discovery was bifurcated between general causation and specific causation.[10] Plaintiffs designated Patricia Williams, Ph.D., a toxicologist, as their sole general causation expert. BP moved to exclude Dr. Williams under *Daubert*, arguing her opinions were unreliable and unhelpful, and also moved for summary judgment. "After carefully reviewing Dr. Williams's reports and her deposition testimony," the Court agreed with BP and found her opinions fell "woefully short of the *Daubert* and Rule 702 standards" because Dr. Williams (1) failed to identify relevant statistically significant associations in the epidemiologic literature and (2) failed to provide anything more than a conclusory analysis of the Bradford Hill factors to explain her opinions. *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *12. The Court also found Dr. Williams's opinions to be unhelpful because she failed to consider available exposure data for the relevant geographical area. *Id.* The Court, thus, entered judgment in favor of BP. *Id.* at 17.

---

[10] Bifurcation promotes judicial efficiency, particularly in mass toxic tort cases, because if plaintiffs are unable to establish general causation, the Court need not address specific causation. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.").

After the First Trial Pool Cases were dismissed, the Court proceeded to select a second group of test cases for discovery.  On September 30, 2021, the Court entered an Order setting four ocular and four sinus test cases on a discovery schedule. *See* ECF Doc. 342, Corrected Amended and Revised Case Management Order ("CARCMO").  Plaintiffs, represented by the Falcon/Lindsay firms and the Downs firm, selected two of the ocular cases and two of the sinus cases, and BP selected two of the ocular cases and two of the sinus cases.  *See* ECF Doc. 348 (identifying the test cases).  Unlike the plaintiffs in the First Trial Pool Cases, the Falcon Group Plaintiffs and the Downs Group Plaintiffs in this second group designated different experts.  As set forth in the CARCMO, "if the *Daubert* or dispositive motions are decided adversely to the test plaintiffs, then all remaining BELO plaintiffs with similar LMPCs in the respective Falcon/Lindsay cases or in the Downs Law Group cases will be bound by the Court's rulings—after appeal, if any—and their cases will be dismissed with prejudice and without further litigation."  ECF Doc. 342 at 5 (discussing preclusive effect of *Daubert* rulings).

## II.    702 AND *DAUBERT*

In a toxic tort case, such as this, a plaintiff must establish both general and specific causation through admissible, reliable expert testimony.  *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1239 (11th Cir. 2005).  Under Federal Rule of Evidence 702, expert testimony regarding scientific, technical, or other specialized

knowledge is admissible if it is: (1) helpful to the jury, (2) based on sufficient facts or data, (3) the product of reliable principles and methods, and (4) demonstrates that "the expert has reliably applied the principles and methods to the facts of the case." The Eleventh Circuit has distilled the Rule 702 requirements into three inquiries: (1) whether the expert is qualified; (2) whether "the methodology by which the expert reaches [a] conclusion[] is sufficiently reliable" under the principles of *Daubert*; and (3) whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue through the application of scientific, technical, or other specialized knowledge. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).

Reliability under *Daubert* is determined by considering: (1) whether the expert's methodology can or has been tested; (2) whether the scientific technique or theory has been subjected to peer review and publication; (3) whether there is a known rate of error for the method; and (4) whether the technique is generally accepted in the scientific community. *See Daubert,* 509 U.S. at 593-94; *Rink*, 400 F.3d at 1292. The court considers "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592–93) (internal quotation marks and alteration omitted).

The helpfulness prong of Rule 702 is concerned with ensuring that expert testimony is not only scientifically reliable but also "relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under *Daubert* the court's role as a "gatekeeper" is to ensure expert testimony is admitted only if it is reliable *and* relevant. *Id.* at 589, 597. The party offering the expert testimony has the burden to establish "these basic requirements——qualification, reliability, and helpfulness." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

## III. GENERAL CAUSATION

There are two broad categories of toxic tort cases. In the first category, the toxicity of a drug or chemical has been recognized by the medical community as being toxic and capable of causing the injuries alleged by a plaintiff. *See McClain*, 401 F.3d at 1239. In those cases, plaintiffs do not need to prove general causation. *See id.* In the second category of cases, there has been no such recognition by the medical community. *Id.* Therefore, a plaintiff proceeding in the second category of cases must prove both general and specific causation. *Id.* In the Williams Order, this Court determined Plaintiffs' cases fall under the second category. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9.

As this Court previously stated, "[g]eneral causation . . . is concerned with whether a 'drug or chemical can cause the harm plaintiff alleges,' that is, whether a

chemical agent 'increases the incidence of disease in a group.'"[11]    *Id.* at *8 (citing *McClain*, 401 F.3d at 1239).   The Eleventh Circuit has recognized three "primary" scientific methodologies as being "indispensable" to proving general causation in a toxic tort case: (1) epidemiological evidence, (2) dose-response relationship, and (3) the background risk of disease.  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).   "A general causation opinion that is not supported by at least one of these primary methodologies is unreliable as a matter of law."  *In re Abilify*, 299 F. Supp. 3d at 1306.  By the same token, the reliability of a general causation opinion is called into question if it considers only one of these primary methods and ignores the others.  *See Chapman*, 766 F.3d at 1307–08.  Each of these methodologies are discussed below.

### A.    Epidemiology

Epidemiology "is generally considered to be the best evidence of causation in toxic tort actions."  *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002).   Epidemiology is "the branch of science that studies the incidence, distribution, and cause of disease in human populations," *In re Abilify*, 299 F. Supp. 3d at 1306, and "examine[s] the pattern of disease in human populations," *Gen.*

---

[11] "Specific causation is established by showing that exposure to the allegedly toxic drug or chemical actually caused an individual plaintiff's injury."  *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1306 (N.D. Fla. 2018).

*Elec. Co. v. Joiner*, 522 U.S. 136, 144 n.2 (1997). There are two steps in establishing causation through epidemiology. The first step requires the expert to identify an association noted in the literature between the drug or chemical in question and the complained of condition. *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (citing Michael D. Green et al., *Reference Guide on Epidemiology*, in Reference Manual on Scientific Evidence 566 (Federal Judicial Center, 3d ed. 2011) (hereinafter, "Ref. Man.")).

Once an association is identified, in the second step, the expert determines whether the association represents "a true cause-effect relationship" between exposure and the disease. *Id.* (citing Ref. Man. at 597). To make that determination, an expert applies the following nine factors developed by Sir Austin Bradford Hill ("the Bradford Hill Factors"): (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *See id.* (citing Ref. Man. at 599–600). No one factor is dispositive and one or more factors may be absent even when a true causal relationship exists. Ref. Man. at 600. Determining whether an association is causal is a matter of scientific judgment, and scientists reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal

inference may be drawn. *Milward v. Acuity Specialty Prods. Group, Inc.*, 639 F.3d 11, 18 (1st Cir. 2011); *see also* Ref. Man. at 553, 600.

### B.    Dose-Response

Another primary methodology for establishing causation is through evidence of a dose-response relationship, which is a "relationship in which a change in amount, intensity, or duration of exposure to an agent is associated with a change— either an increase or decrease—in risk of disease". *McClain*, 401 F.3d at 1241. The relationship between dose and response is "the hallmark of basic toxicology" and the "single most important factor to consider" in evaluating the toxicity of a drug or chemical. *Id.* at 1242; *see also Chapman*, 766 F.3d at 1307. This is because virtually all substances have the potential to be harmful at high enough doses. *See id*; *see also* Bernard D. Goldstein et al., *Reference Guide on Toxicology*, in Ref. Man. at 636. Inherent in this principle is the fact that, for the vast majority of substances, there are threshold doses below which no individual will respond and doses above which nearly everyone responds. *See McClain*, 401 F.3d at 1242. Consequently, a reliable expert opinion on general causation should address what levels of exposure to a drug or chemical increase the risk of adverse effects. *See id.* at 1241. Indeed, "'[t]he expert who avoids or neglects [this] principle of toxic torts without justification casts suspicion on the reliability of his methodology."

*Kilpatrick v. Breg., Inc.*, 613 F.3d 1329, 1339 (11th Cir. 2010) (quoting *McClain*, 401 F.3d at 1242).

### C.    Background Risk of Disease

Finally, "background risk" of disease "is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges *without* exposure to the drug or chemical in question.  The background risks include all those causes of a disease, whether known or unknown, excluding the drug or chemical in question."  *McClain.* 401 F.3d at 1243 (emphasis in original). This is important because the aim of the other primary methodologies is to identify "agents that are associated with an increased risk of disease."  *See* Ref. Man. at 552. An expert must know the background prevalence of a disease before he can determine whether the risk of that disease is increased as a result of exposure to the agent.  *See In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d 1345, 1355 (S.D. Fla. 2011), *aff'd sub nom.*, *Chapman*, 766 F.3d 1296.  Without background risk to establish a baseline, it is difficult to determine whether any incidence of a disease in individuals exposed to an agent is anything more than a coincidence. *Chapman*, 766 F.3d at 1308.  Thus, a failure to identify or describe the background risk of a disease is a "serious methodological deficiency" and "substantial weakness" in an expert's general causation opinion.  *See id.* at 1307–08.

### III.   ANALYSIS

As stated above, Plaintiffs have designated three (3) experts in this matter, Dr. Jerald Cook, Dr. Rachael Jones, and Dr. John Cherrie.  Drs. Jones and Cherrie are industrial and occupational hygienists, respectively, who purport to provide categorial "exposure assessments"[12] for Plaintiffs.  Drs. Jones and Cherrie do not provide any causation opinions and acknowledge the purpose of their joint report "was not intended to establish general causation."[13]  ECF Doc. 497-1 at 5 (Cherrie Supp. Decl.); *see also* ECF Doc. 494-1 at 6 (Jones Supp. Decl.) (stating a "causation assessment" "lies with others").   Instead, their assessments are to be used or considered by general causation experts in arriving at a causation opinion.  Thus, given the limited nature of their opinions, Plaintiffs conceded that if the Court excludes Dr. Cook's opinions, it need not address the opinions of Drs. Jones and Cherrie, as they cannot stand on their own for general causation.[14]   *See, e.g.*, *Campbell v. B.P. Expl. & Prod., Inc.*, 2022 WL 17251115, at *13 (E.D. La. Nov. 28, 2022) ("Although plaintiff has also retained Dr. Rachel Jones as a 'general exposure

---

[12] Dr. Cherrie defines "exposure assessment" as "the process through which it is identified whether a person is exposed or not (as a dichotomous classification) to a particular agent and if the individual is exposed, to develop a ranking of subjects by exposure level."  ECF Doc. 497-1 at 1.
[13] Plaintiffs initially designated Drs. Jones and Cherrie as "general causation" experts, but it is clear they provide no general causation opinions and did not undertake to do so – a point Plaintiffs eventually conceded at the hearing.
[14] Given this concession, Plaintiffs withdrew their request for oral argument on Drs. Jones and Cherrie at the hearing, and the parties agreed the Court should decide the matter based on the written materials and evidence in the record.

assessment' expert, she does not provide a general causation opinion, nor does she provide the information or analysis that Dr. Cook's report lacks.").[15]  Thus, the undersigned will focus on Dr. Cook's opinions.

Jerald Cook, M.D., is a retired Navy physician who conducts "clinical practice and consulting services in disability and toxicology."  ECF Doc. 463-1 at 2.  He specializes in occupational and environmental medicine.  *Id.* at 2–3.  As set forth in this report, Dr. Cook offers the following opinion on general causation:

> The scientific evidence available to me at the time of writing this report [sic] it is within a reasonable degree of medical certainty that oil spill cleanup workers exposed to crude oil and tar (and the associated chemical components such as PAH), PM2.5, can cause [sic] the medical problems dry eye disease, conjunctivitis, sinusitis, and/or rhinosinusitis.

ECF Doc. 463-1 at 16.

BP argues Dr. Cook's opinions should be excluded because he fails to (1) identify either a specific chemical alleged to have caused the conditions complained of by Plaintiffs or the level at which such chemical could cause the complained of conditions and (2) fails to comply with recognized epidemiological methodology for establishing general causation.  ECF Doc. 463 at 11–24.  Thus, BP argues the opinions are neither reliable nor helpful.[16]  *Id.* at 11, 35.  After considering the

---

[15] Although Dr. Jones provides an exposure opinion for Dr. Cook in other BELO cases, this is the only case which includes Dr Cherrie.

[16] BP does not dispute Dr. Cook's qualifications.

parties' arguments and the evidence in the record, including Dr. Cook's report, ECF Doc. 463-1, his deposition testimony, ECF Doc. 463-2, and Plaintiffs' opposition, ECF Doc. 501, the undersigned agrees. Nowhere in Dr. Cook's 19-page report does he explain how he reached his causation opinion, and it is clear from the report that Dr. Cook did not identify a harmful dose of any chemical that could cause the LMPCs at issue and did not follow any epidemiological methodology.

### A. Failure to Identify a Harmful Dose or Chemical

The law in this Circuit is clear – the harmful level of exposure to a chemical is a "minimal fact[]" necessary to sustain the plaintiff's burden. *See McClain*, 401 F.3d at 1241. In the Williams Order, this Court expressly stated that, for Plaintiffs to carry their burden on general causation, they must introduce reliable expert testimony, which demonstrates: 1) "the levels of exposure that are hazardous to human beings generally" and 2) "the substance's 'general toxicity for the harm Plaintiffs allege.'" *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *9.

However, as Dr. Cook admitted in his deposition, his report fails to identify either of those two essential levels of exposure. Dr. Cook does not "give a level of exposure to any substance necessary to produce chronic rhinosinusitis," "chronic rhinitis," or "chronic dry eye syndrome." *See* J. Cook Depo., at 148. Dr. Cook admits none of the studies he relied upon, discussed more below, "address what level of exposure would be unsafe for humans for these conditions." *Id.* at 200. In

fact, even though he acknowledges "the dose equals [the] poison," he contended in the deposition that the maxim applies to things that are "not very harmful," such as water, and not to "things that are just inherently harmful, not natural to be in the human body."  J. Cook Depo., at 150:8–20.  Dr. Cook's position, however, is contrary to what this Court and the Eleventh Circuit have considered to be necessary criteria to establishing general causation.  An opinion that any amount is harmful is simply contrary to the law in this circuit.  *See McClain*, 401 F.3d at 1241 (faulting expert for failing to offer any "testimony about the dose of Metabolife required to injure Plaintiffs or anyone else" and being unable to say "how much is too much").

Plaintiffs do not dispute the fact that Dr. Cook failed to identify the harmful level of exposure or relied on insufficient epidemiological studies.[17]  Instead, Plaintiffs attribute these failures to "BP's failure to gather the correct data through dermal measurements and biomonitoring."  ECF Doc. 501 at 1–2.  Plaintiffs also argue that the dose levels are provided by Drs. Jones and Cherrie.  Plaintiffs' arguments are unavailing.

---

[17] Unlike the Downs Law Group Plaintiffs, who are also in this second test group and who have argued a general causation expert, relying primarily on epidemiology, does not have to provide a harmful dose as part of general causation, the Falcon Group Plaintiffs here do not seem to make the same argument.  Nonetheless, to the extent they have, for the reasons set forth in the separate Report and Recommendation as to the Downs Law Group Plaintiffs' experts, that argument fails.

To support their first argument, Plaintiffs move to supplement their opposition with a November 8, 2022, affidavit from the former Director of the National Institute of Environmental Health Sciences ("NIEHS"), Dr. Linda Birnbaum.  ECF Doc. 558.  In the affidavit, Dr. Birnbaum contends it "is not plausible" to derive a level of exposure based on the existing data; for such an assessment, biological monitoring data is needed, and "the GuLF STUDY[18] exposure assessment and epidemiology are the current, best, and state of the art" science.  ECF Doc. 558-2 at 5–7.  As an initial matter, BP opposes the supplement as an untimely expert opinion.  The undesigned agrees and recommends the motion to supplement, ECF Doc. 558, be DENIED.

Under Fed. R. Civ. P. 26(a)(2)(A), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  These disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Compliance with Rule 26 "is not merely aspirational."  *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*,

---

[18] As explained by Dr. Cook, the Gulf Long-term Follow-up Study ("GuLF STUDY") was a study involving over 32,000 cleanup workers to investigate the health effects that may occur from the cleanup work.  ECF Doc. 463-1 at 8.  Dr. Cherrie authored the GuLF Dream paper, which was part of the GuLF STUDY, and seeks to estimate the exposure of study participants in the absence of dermal exposure measurements.  ECF Doc. 497-1 at 6–7.

546 U.S. 454 (2006).  Compliance is necessary to allow "both sides in a case to prepare their cases adequately and to prevent surprise." *Id*.

A party who fails to comply with Rule 26 may be prohibited from using the identified witness at trial "unless the failure was *substantially justified* or is *harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added).  "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)) (internal quotation marks omitted).

"Courts enjoy broad discretion under Rule 37(c)(1) to exclude evidence." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-MD-2885, 2021 WL 763778, at *2 (N.D. Fla. Jan. 15, 2021) (quoting *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019) (noting that appellate courts review a district court's exclusion of evidence for an abuse of discretion)).  In exercising that discretion, courts generally consider the following four (4) factors: "(1) the importance of the excluded material; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the material to be used at trial; and (4) the ability to cure such prejudice." *See id.* (citing *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015).

Considering those factors here, the Court finds the motion to supplement should be DENIED.

Dr. Birnbaum's affidavit contains expert opinions and the expert disclosure deadline has come and gone. It would be prejudicial to BP to allow a new expert to be designated four (4) months after *Daubert* motions have been filed and on the cusp of the Court's resolution of them. Moreover, even if the Court were to consider the affidavit, it does not necessarily help Plaintiffs as it begs the question of why NIEHS, which put approximately $70,000,000 into the GuLF STUDY, did not collect the data. Additionally, Plaintiffs' reliance on the affidavit is a red herring, similar to their spoliation argument, *infra* Section V, because this Court and other BELO courts have repeatedly determined there exists a world of available data, studies, and literature, which Plaintiffs' experts can consider. *See In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *15.

Second, the exposure assessments provided by Drs. Jones and Cherrie, even if reliable and relevant, do not identify a harmful dose of any chemical in the weathered oil. Instead, their report simply attempts to categorically identify the exposure of the Plaintiffs to the chemicals in weathered oil. ECF Doc. 461-1, Doc. 464-1. As described in Dr. Cook's report, "Cherry (sic) and Jones provided exposure assessments [for the Plaintiffs] based on their work activities" and "explain that there were exposures to dispersants, PAH from tar or crude oil, fine

particulate matter (PM2.5), sand particles, and oily water." ECF 463-1 at 6. They do not identify a dose level. Because the gist of the opinions provided by Drs. Jones and Cherrie is that the "cleanup workers could have been exposed to weathered crude oil and tar balls, [and] volatile organic compounds," *id.* at 5, their opinions are of no use unless Plaintiffs have an expert to testify about the harmful level of any of those chemicals – something Dr. Cook simply does not do.

As BP points out, Dr. Cook's failure to identify a dose level or specific chemical has led six different judges—including Judge Barbier who presided over the MDL—to exclude his opinions in over 100 other BELO cases.[19] *See, e.g.*, *Johns v. BP Expl. & Prod.*, 2022 WL 1811088, at *6 (E.D. La. June 2, 2022) (excluding Dr. Cook's opinions because he did not identify the dose of the toxic chemicals necessary to cause any of the complained-of health conditions); *Barkley v. BP Expl. & Prod.*, 2022 WL 2342474, at *4 (E.D. La. June 29, 2022) (finding Dr. Cook's opinions unreliable and inadmissible because he did not identify the dose of any chemical that would result in the adverse health effect contained in the report); *Brumfield*, 2022 WL 1725111, at *7 (finding "Dr. Cook's failure to identify the level of exposure to a relevant chemical that can cause the conditions asserted in plaintiff's complaint renders his opinion unreliable, unhelpful, and incapable of

---

[19] At the time BP filed its motion in July, Dr. Cook had been excluded over 50 times in BELO cases. It appears, since July, he has been excluded in at least approximately 50 additional cases, some of which are referenced herein.

establishing general causation"). The undersigned agrees with those other decisions—Dr. Cook's failure to identify a harmful dose level of any chemical which is capable of causing the medical conditions at issue renders his opinions unreliable and unhelpful.

## B. Failure to Follow an Acceptable Epidemiological Methodology

BP also argues Dr. Cook's opinions should be excluded because he fails to follow acceptable methodology for relying on epidemiological data to support a causation opinion. ECF Doc. 463 at 15–24. Specifically, BP argues Dr. Cook (1) failed to identify an association between the chemicals in the oil spill and Plaintiffs' reported conditions; (2) failed to critique the literature upon which he relied, and (3) failed to apply the Bradford Hill factors. *Id.* at 16–24. Once again, the undersigned must agree.

As discussed above, a reliable epidemiology method involves 2 steps. The "essential first step requires the expert to identify an association noted in the literature between exposure to the toxic agent and a particular disease or adverse effect." *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (citations omitted). Only after such an association is detected may the expert evaluate "whether the identified association 'reflects a true cause-effect relationship' between exposure to the substance at issue and the disease" using the Bradford Hill criteria. *See id.* (citations and quotations omitted); *see also* Bradford Hill, *The Environment*

*and Disease: Association or Causation?*, 58 Proc. Royal Soc. Med. 295, 295 (1965) (the criteria are to be considered after "observations reveal an association between two variables, perfectly clear-cut and beyond what we would care to attribute to the play of chance" but "before deciding that the most likely interpretation of it is causation"). "This is the *sine qua non* of general causation." *In re Abilify*, 299 F. Supp. 3d at 1307.

Nowhere in Dr. Cook's report, however, does he discuss any literature or study which identified an association between any of the chemicals to which Plaintiffs were allegedly exposed and LMPCs from which they purportedly suffer. *See* ECF Doc. 463-1 at 6–16. In fact, he never identifies any such association in the literature, before or after analyzing the relevant criteria, and even at his deposition he said he did not know whether the studies he relied upon identified an association between exposure to any toxin in the oil or dispersants and any of the conditions at issue. J. Cook Depo., at 186:3–13; *see also* ECF Doc. 501 at 3 (Plaintiffs do not dispute Dr. Cook admitted the studies he relied upon do not support an association between any chemical and the conditions at issue). His failure to do so renders his opinions unreliable. *See, e.g.*, *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806434, at *12 (M.D. Fla. June 18, 2009) ("the reliability of an expert's opinion should be seriously questioned, and perhaps even excluded altogether, when the expert can point to *no* evidence showing a statistically significant increased risk of disease")

(emphasis in original); *Soldo v. Sandoz Pharms. Corp.,* 244 F. Supp. 2d 434, 533–34 (W.D. Pa. 2003) (finding medical experts' general causation opinions unreliable because none of the epidemiologic studies upon which they relied showed a statistically significant positive association between the drug and the disease at issue).

Instead, Dr. Cook jumps directly to the Bradford Hill factors, which is not proper methodology. *See, e.g.*, *Frischhertz v. SmithKline Beecham Corp.*, 2012 WL 6697124, at *3 (E.D. La. Dec. 21, 2012) ("The Bradford–Hill criteria can only be applied after a statistically significant association has been identified."); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 174 F. Supp. 3d 911, 916 (D.S.C. 2016) ("[w]hile a causation opinion need not be based on epidemiological studies, it is well established that the Bradford Hill method used by epidemiologists *does* require that an association be established through studies with statistically significant results") (internal citation omitted) (emphasis in original). In doing so, Dr. Cook improperly assumes an association exists and uses an analysis of the Bradford Hill criteria to substantiate his hypothesis. *See* ECF Doc. 463-1 at 6–16.

Regardless, Dr. Cook provides no more than a cursory analysis of the Bradford Hill factors. For strength of the association, for example, Dr. Cook does no more than briefly describe the GuLF Study, the Kwok 2017 study, and the

Alexander 2018 study. *Id.* at 8–9. There is no critical analysis of those studies or even what their results were – a point he admits in his deposition. *See* J. Cook Depo., at 169:13–17, 178:4–10. Indeed, as stated above, Dr. Cook did not know whether any of those studies identified an association. Similarly, Dr. Cook's discussion of the dose-response relationship provides no dose-response relationship at all and, instead, simply defines what a dose-response relationship means and then discusses the pathways of exposure. *Id.* at 9–10. The fact that Dr. Cook includes 3 pages of references identifying various articles and studies in his report does not make his opinions reliable. *See In re Deepwater Horizon Belo Cases*, 2022 WL 104243, at *12 ("[a]n expert opinion, even if supported by a lengthy list of case studies and treatises, is not reliable without an explanation of the logical steps supporting it").

In Plaintiffs' opposition, they do not necessarily explain the reason the studies Dr. Cook relied upon are insufficient; instead, they explain the studies are insufficient because "there exists no robust body of epidemiology for chronic conjunctivitis," and there is no requirement that an expert on general causation "always rely on epidemiology." ECF Doc. 501 at 3. While that may be the case, it is clear that a general causation expert must support his opinion by at least one of the "indispensable" methods identified by the Eleventh Circuit. *See Chapman*, 766 F.3d at 1308. Dr. Cook, however, has not done that. He certainly is not relying on the dose-response relationship to support his general causation opinion, since he has

failed to identify one. And his report is devoid of any discussion of background risk of disease.

Given these wholesale failures, Plaintiffs appear to suggest Dr. Cook's opinions are supported by "[b]iological [p]lausibility." ECF Doc. 501 at 2–4. Plaintiffs' argument is misplaced. In the Williams Order, this Court specifically stated that "in the absence of a statistical association supported by an epidemiologic study, 'secondary' evidence, even within the Bradford Hill factors, such as biological plausibility . . . standing alone or in the aggregate, are 'insufficient proof of general causation.'" *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *10 (citations omitted). That is, if the epidemiological literature does not reveal an association between the chemical components and the conditions at issue, then the Bradford Hill criteria do not apply at all. *See id.* Plaintiffs cannot cure the glaring deficiencies in Dr. Cook's report by over-relying on a single Bradford Hill factor. *See In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1296 (M.D. Fla. 2007) ("[B]iological possibility is not proof of causation.").

In sum, Dr. Cook's proffered testimony does not comport with the standards for admissibility under Rule 702 and *Daubert* or the Eleventh Circuit's framework for evaluating expert opinions on general causation. Instead, it resembles the type of *ipse dixit* that has been consistently rejected by the courts in our Circuit, including

this Court.  *See, e.g.*, *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at

\*12.  The undersigned, therefore, recommends Dr. Cook's opinions be excluded.

## V.    SPOLIATION

Presumably realizing the inadequacies of the expert opinions, Plaintiffs shift

gears and argue the Court should admit Plaintiffs' experts, despite their

shortcomings, as a sanction for BP's spoliation of evidence.  Specifically, Plaintiffs

argue BP has spoiled evidence through its "decision not to do biomonitoring and

dermal monitoring of cleanup workers."  ECF Doc. 547 at 1.  Plaintiffs' argument,

however, is misplaced because it is not based on BP's willful destruction of

evidence, but rather on BP's failure to create evidence for this litigation.  Thus, not

surprisingly, Plaintiffs' spoliation motion has also been resoundingly rejected by

other BELO courts.  *See e.g., Campbell*, 2022 WL 17251115 at \*13 (granting motion

to exclude Dr. Cook and BP's motion for summary judgment, and denying motion

for sanctions based on spoliation); *Moore v. BP Expl. & Prod. Inc.*, 2022 WL

16694238 (E.D. La. Nov. 3, 2022) (denying motion to deem admissible Cook's

opinion based on BP's spoliation of evidence); *Lutin v. BP Expl. & Prod. Inc.*, 2022

WL 16694169 (E.D. La. Nov. 3, 2022) (same); *Fairley v. BP Expl. & Prod. Inc.*,

2022 WL 16731817 (E.D. La. Nov. 3, 2022) (same); *Harris v. BP Expl. & Prod.,

Inc.*, 2022 WL 16851174 (E.D. La. Nov. 10, 2022) (denying motion for

reconsideration of order excluding Dr. Cook's testimony based on BP's decision not

to collect dermal and biometric data from cleanup workers); *Pettaway v. BP Expl. & Prod., Inc.*, 2022 WL 16851254 (E.D. La. Nov. 10, 2022) (same); *Cotton v. B.P. Expl. & Prod., Inc.*, 2022 WL 16712868 (E.D. La. Nov. 4, 2022) (same).

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence." *Calixto v. Watson Bowman Acme Corp.*, 2009 WL 3823390, at *13 (S.D. Fla. Nov. 16, 2009) (citing Black's Law Dictionary 1437 (8th ed. 1999)). A party seeking spoliation sanctions has the burden of proving must (1) the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and (3) the evidence was crucial to the movant being able to prove its prima facie case or defense. *Managed Care Sols., Inc. v. Essent Healthcare, Inc.,* 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010). Even if all three elements are met, "[a] party's failure to preserve evidence rises to the level of sanctionable spoliation "only where the absences of that evidence is predicated on bad faith," such as where a party purposely loses or destroys relevant evidence. *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir.1997).

As Judge Vance in the Eastern District of Louisiana noted, BP's motion is flawed in several ways. *Brumfield*, 2022 WL 17251113, at *11. First, BP had no obligation to "develop evidence that might at some future day have aided potential plaintiffs in making claims against BP." *Fairley*, 2022 WL 16731817, at *3. Spoliation refers to the destruction of existing evidence, and not to the failure to

create evidence. *See Garcia v. Vitus Energy, LLC,* -- F.Supp.3d --, 2022 WL 1289670, at *3 (D. Alaska Apr. 29, 2022) (declining to sanction defendant for spoliation for failing to chemically test an employee for alcohol use following an accident) (collecting cases). As the *Fairley* court noted, Plaintiffs' argument that "evidence of exposure was 'created' and 'existed' when the future B3 plaintiffs were exposed to weathered oil and BP failed to 'preserve' it by conducting a monitoring program" is nothing short of "absurd[]". *Id.* A "failure to collect evidence that may or may not have been available for collection is very different from the intentional destruction of evidence that constitutes spoliation." *United States v. Greco*, 734 F.3d 441, 447 (6th Cir. 2013). Plaintiffs' "position that BP had a duty to create evidence by bringing monitoring data into existence has no limiting principle but would cause parties and courts to 'go down the bottomless hole' of capturing the next untaken photograph, interviewing the next uninterviewed witness, or testing the next untested person, place or thing, with no idea of where the proposed duty ends." *Id.* "Plaintiff offers no legal authority, and the Court finds none, for the proposition that a federal court may sanction a party for 'spoliating' evidence that never existed." *Garcia*, 2022 WL 1289670, at *3.

Second, even if the Court were to contort the concept of spoliation and apply it to BP's failure to conduct monitoring, Plaintiffs have failed to show BP had an obligation to conduct monitoring. After the Exxon Valdez spill in 1989, Congress

passed the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. 2701, et seq., which allowed federal and state governments to recover for damages to natural resources from an oil spill through an assessment and recovery process known as the Natural Resource Damage Assessment or "NRDA." *Gulf Restoration Network v. Jewell,* 161 F. Supp. 3d 1119, 1123–24 (S.D. Ala. 2016); Melissa Trosclair Daigle, *The Value of a Pelican: An Overview of the Natural Resource Damage Assessment Under Federal and Louisiana Law*, 16 Ocean & Coastal L.J. 253, 256 (2011);15 C.F.R. § 990.10 (NRDA regulations).  The federal and state governments'—as well as BP's—response to the DWH Spill was guided by the OPA.  The trustees, which included representatives of the federal and affected state governments, assessed damages to natural resources caused by the discharge of oil and developed and implemented "a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship." *Jewell,* 161 F. Supp. 3d at 1124.

"On April 23, 2010, the Unified Area Command ("UAC")—an organization that included members from the United States Coast Guard, BP, and others—was created to oversee the management of the oil spill.  The UAC had authority to set overall strategy and priorities, allocate critical resources, and ensure that objectives were met and strategies followed." *Kaminski v. BP Exploration & Prod. Inc.*, 975 F. Supp. 2d 1220, 1223 (M.D. Fla. 2013) (citations omitted).  Members of the UAC

included BP and others from the government sector.  As this Court explained in the Williams Order, "the UAC engaged in extensive and coordinated data collection and environmental monitoring efforts, in what has been characterized as 'the largest environmental investigation of an oil spill ever undertaken.'"  *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *4.  Plaintiffs not only leave the government's oversight of the data collection efforts out of its motion, but Plaintiffs also failed to present any evidence the UAC ever directed, or even requested, that BP undertake biomonitoring or dermal testing.  Moreover, this testing was never initiated by the government.

Regardless, as alluded to earlier, in the Williams Order this Court discussed at length the massive amount of data that is available to Plaintiffs.  *Id.*  The Court pointed out, for example, the existence of extensive "air quality" data, water samples, and 2000 air samples.  *Id.*  The fact Plaintiffs' experts have found nothing in this data collected for the DWH Spill and nothing in the "universe of epidemiology and toxicology literature studying the chemicals at issue" to support general causation in these BELO cases may not be because the data is "bad" as Plaintiffs proffer, but simply be that the science is not there to support causation.  *See Harrison v. BP Expl. & Prod. Inc.*, 2022 WL 2390733 at * 7 (E.D. La. July 1, 2022) (rejecting argument that Cook could not identify a harmful level of exposure because BP failed to collect monitoring data); *see also, In Re: Zantac (Ranitidine)*

*Products Liability Litigation*, 2022 WL 17480906, at *3 (S.D. Fla. Dec. 6, 2022) (granting *Daubert* motions on all general causation experts because "there is no scientist outside this litigation who concluded ranitidine causes cancer, and the Plaintiffs' scientists within this litigation systemically utilized unreliable methodologies with a lack of documentation on how experiments were conducted, a lack of substantiation for analytical leaps, a lack of statistically significant data, and a lack of internally consistent, objective, science-based standards for the evenhanded evaluation of data").

Based on the above, the undersigned finds no evidence of spoliation by BP and, thus, the motion to admit the experts based on spoliation should be DENIED.

## VI.   MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-248 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."). The moving party bears the burden of establishing that there is no genuine dispute of fact and that the plaintiff has failed to establish an essential element of the claim. *See Allen v. Bd. of Pub. Educ*., 495 F.3d 1306, 1313 (11th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To avoid summary judgment, the nonmoving party must

then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal marks omitted). However, summary judgment cannot be avoided through evidence that is "inadmissible at trial." *Chapman*, 766 F.3d at 1313 (quoting *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007)).

As set forth above, it is well settled that to establish general causation, Plaintiffs must present admissible expert testimony. *See Chapman*, 766 F.3d at 1308, 1316. Without such testimony, Plaintiffs cannot create a material question of fact. Here, because the undersigned finds Dr. Cook should be excluded, and Plaintiffs have designated no other general causation experts, the undersigned recommends the motion for summary judgment be granted.

Accordingly, it is RECOMMENDED:

1.    BP's *Daubert* motion to exclude the opinions of Dr. Jerald Cook, ECF Doc. 463, be GRANTED.

2.    Plaintiffs' motion for leave to supplement Plaintiffs' opposition to BP's *Daubert* motion for Dr. Cook, ECF Doc. 558, be DENIED.

3.    Plaintiffs' motion to admit expert testimony based on spoliation of evidence, ECF Doc. 547, be DENIED.

4.    The clerk be directed to terminate the *Daubert* motions for Dr. John Cherrie, ECF Doc. 461, and Dr. Rachael Jones, ECF Doc. 464, as MOOT.

5.    The clerk be directed to terminate the following motions related to BP's *Daubert* motions on Dr. Cherrie and Dr. Jones, as MOOT:

> a.  BP's motion to strike the supplemental declaration of Dr. Jones, ECF Doc. 528;
>
> b.  BP's motion to strike the supplemental declaration of Dr. Cherrie, ECF Doc. 524;
>
> c.  Plaintiffs' motion for leave to file a supplemental opposition to BP's motion to exclude Dr. Jones, ECF Doc. 557; and
>
> d.  Plaintiffs' motion for leave to file a supplemental opposition to BP's motion to exclude Dr. Cherrie, ECF Doc. 559.

6.    BP's motion for summary judgment, ECF Doc. 465, be GRANTED.

7.    Judgment be entered in favor of BP in these test cases as well as in all cases represented by the Falcon/Lindsay firm in this Master Action, which have been stayed, and which involve the LMPCs at issue in these test cases.

At Pensacola, Florida, this 15th day of December 2022.


*s/ Hope Thai Cannon*
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**